UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

Sharon J.,[1]                              )    Civil Action No. 5:22-2125-KDW
                                           )
                            Plaintiff,     )
                                           )
vs.                                        )
                                           )              ORDER
Kilolo Kijakazi, Acting Commissioner       )
of Social Security Administration,         )
                                           )
                           Defendant.      )

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").

The issues before the court are whether the decision is supported by substantial evidence and

whether the Commissioner's decision contains an error of law. Having carefully considered the

parties' submissions and the applicable law, for the reasons that follow, this court affirms the

Commissioner's decision.

I.      Relevant Background

        A.      Procedural History

        On January 4, 2019, Plaintiff filed an application for DIB alleging a disability onset date

of June 15, 2016.[2] Tr. 12. On February 2, 2019, Plaintiff's claim was denied after reconsideration

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of
the United States has recommended that, due to significant privacy concerns in social security
cases, federal courts should refer to claimants only by their first names and last initials.
[2] Plaintiff filed four previous applications for disability benefits that were denied or dismissed. Tr.
12-13.

of her request for disability benefits. Tr. 143-45. Plaintiff requested a hearing before an administrative law judge ("ALJ") and a hearing was scheduled. Tr. 146-54. On May 5, 2021, a hearing was held before ALJ Randall Huggins. Tr. 34-63. During the hearing, testimony was taken from Plaintiff, who was represented by counsel, and from a vocational expert ("VE"). *Id.* After the hearing, on May 11, 2021, Plaintiff amended her alleged onset date to June 18, 2016. Tr. 215.  On July 9, 2021, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 9-29. Plaintiff requested review of the decision from the Appeals Council. Tr. 188-89. The Appeals Council denied Plaintiff's request for review on May 3, 2022, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Tr. 1-5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed July 5, 2022. ECF No. 1.

      B.     Plaintiff's Background

      Born in 1970, Plaintiff was 46 years old on her date last insured of December 31, 2016. Tr. 277. An April 2019 Disability Report-Adult form completed by Plaintiff's non-attorney representative, noted that Plaintiff completed high school, did not attend special education classes, and had completed courses at Job Corp in Culinary Arts in 1992. Tr. 270. Her past relevant work ("PRW") is listed as manufacturing material capper (1998), manufacturing material cutter (July 1999-May 2004), and food service cashier (Oct. 2005-Nov. 2011). Tr. 270-71. The report indicated Plaintiff stopped working on November 8, 2011, because of her conditions listed as two right knee replacements, herniated disc L3 and L4, arthritis, depression, and anxiety. Tr. 269. In this report Plaintiff indicated that she was 5'2" tall,[3] weighed 230 pounds, and her conditions caused her pain or other symptoms. *Id.*

---

[3] A 2017 Disability Report completed by Plaintiff indicated Plaintiff's height as 5'9" tall, Tr. 218,

C.    Administrative Proceedings

Plaintiff appeared with counsel for her administrative hearing in Charlotte, North Carolina on May 5, 2021. Tr. 34. VE Kenneth Bennett also appeared and testified. *Id.* Due to the extraordinary circumstances of the Covid-19 pandemic, the hearing was conducted by telephone. Tr. 36.

1.    Plaintiff's Testimony

Plaintiff acknowledged that her date last insured of December 2016 was five years earlier. Tr. 40. In response to questions from the ALJ, Plaintiff testified that in the last five years her "weight was up and down" and she currently weighed more. Tr. 41. Plaintiff testified that she completed high school, she is right-handed, she does not smoke cigarettes, and she is 5'9" tall. *Id.* Plaintiff testified that she was not able to go back to work since 2011. *Id.* She stated that she does not have a current driver's license but has a driver's permit. *Id.* Plaintiff stated that she once had a driver's license but it got suspended in 2000 because she hit someone and did not have car insurance. Tr. 42. Plaintiff confirmed that she was still living in the Chester, South Carolina area and she gets around with the help of her friends, her daughters, and her Worker's Compensation from Burger King. *Id.* Plaintiff testified that her claim had settled, but she is under life care for medical services. Tr. 43. Plaintiff confirmed that she had one substantial job where she worked for Seamless Sensations as a material cutter. *Id.* Plaintiff testified that she worked with another person and they would lift heavy rolls of material onto the table, and then roll out the material and cut it into certain amounts of yardage. *Id.* She also stated that she would sometimes operate a machine when working with comforters. Tr. 43-44. Plaintiff could not recall the heaviest weight she had to lift or carry. Tr. 44.

---

and at the administrative hearing Plaintiff testified that she was 5'9" tall, Tr. 41.

The ALJ asked the VE to identify the job Plaintiff described. Tr. 44. The VE identified it as garment parts cutter, Dictionary of Occupational Titles ("DOT") number 781.684-014, SVP of 5, and medium exertional level. *Id.*

Plaintiff's attorney noted Plaintiff had surgery on her right knee in 2015 and asked Plaintiff what symptoms she was having with her right knee in 2016. Tr. 45. Plaintiff testified that she was having swelling and aching, she could not walk on it, and she was using a cane. *Id.* Plaintiff testified she was unable to get in and out of bed by herself, she could not take a shower, and she was in a lot of pain. *Id.* Plaintiff stated that the pain "messes with [her] back and [her] right hip." *Id.* Plaintiff stated that the cane was prescribed for her by a doctor and she was using it at all times. Tr. 46. Plaintiff testified that in 2016 she "would have to stop constantly" when walking due to pain and that she could stand for about ten minutes. *Id.* She stated that the radiating pain in her hip and back was constant and she is still seeing her primary care doctor for those issues. *Id.* She testified that in 2016 she was having constant pain in her back and it felt like "something pushing up against [her] nerves." Tr. 47. Plaintiff stated that in 2016 she experienced numbness down her left knee the majority of the time. *Id.* She also stated that in 2016 she was having issues with balance and unsteadiness and that is why she had to use the cane. Tr. 48. She also testified to having difficulty using stairs. Tr. 48-49. She testified that a doctor told her that she should not do any stooping, reaching above her head, or bending. Tr. 49. Plaintiff stated that reaching above her head "would be messing with [her] back." *Id.* She stated that because of nerve issues in her back she had problems with her hands related to opening things, holding onto things or dropping things. *Id.* Plaintiff testified that in 2016 she could not lift a pound, she could sit upright in a chair for "about five minutes," and she spent most of her day lying down on her side. Tr. 50. She stated that she was on pain medications gabapentin and Norco, and medication for insomnia. Tr. 51. She

stated that the medications did not help with her knee pain, and the gabapentin was making her sick and had her "drowsy all the time." Tr. 51-52. She said she was given nausea medication but it made her constipated. Tr. 52. Plaintiff testified that in 2016 she was getting three or four hours of sleep at night due to being restless and in pain from her back. *Id.* She stated that during the day she was moody, but her energy was "all right." *Id.* She testified that her daughter would do her laundry, but Plaintiff could sit and fold clothes. She stated "the majority of the time, [she] had somebody else cooking for [her]" but she could prepare cereal or oatmeal. *Id.* Plaintiff stated that she needed help with getting in and out of the bathtub and sometimes with other personal hygiene issues. Tr. 53. Plaintiff testified that in 2016 she would spend a "bad day" trying to alleviate pain by taking her medicine and lying down with her legs and feet propped up. She stated that she would use a heating pad or ice pack. Tr. 54. Plaintiff stated that would occur at least five days out of a week. *Id.* Plaintiff testified that in 2016 on a typical day she would "just look at TV for a little bit and [her] daughter will come and she would help [her] do what [she] need[ed] to do to get set up. And the majority of the day, [she's] just laying down looking at TV." *Id.*

The ALJ resumed questioning of Plaintiff and asked what prevented her from being able to lift. Tr. 55. Plaintiff responded that it was her back. *Id.* The ALJ noted that recent imaging of the cervical spine appeared relatively normal and asked Plaintiff what was wrong with her back. Tr. 55-56. Plaintiff testified that she had a lot of pain in the middle of her back and her doctor usually gives her a steroid injection or prednisone to help with it. Tr. 56. Noting the prior administrative decision of June 17, 2016 and Plaintiff's alleged onset date of June 15, 2016, the ALJ asked Plaintiff what changed with her physical condition during the six-month period between June and December 2016. *Id.* Plaintiff testified that her back and knee got worse. Tr. 57. The ALJ asked about the lack of reference to a cane during the relevant period. *Id.* Plaintiff stated she was

using a cane right after her first knee replacement and the orthopedist told her to continue using her cane for balance. *Id.* Plaintiff's attorney indicated a notation in the file from 2015 that instructed Plaintiff to use a cane and that she would be going through gait training to improve her stability. Tr. 57-58. Plaintiff testified that she began taking medication for depression in November 2020. Tr. 58.

### 2. VE's Testimony

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and experience with the following limitations:

> Assume she can perform a full range of sedentary work except that she could climb ramps and stairs occasionally. She should never climb ladders, ropes, or scaffolds. She can stoop, kneel, crouch, crawl, push and pull occasionally. She should avoid concentrated exposure to extreme vibration, unprotected heights, and moving mechanical parts.

Tr. 58-59. The VE testified that hypothetical individual could not perform Plaintiff's past work but could perform other work such as election clerk, DOT number 205.367-030, SVP of 2, sedentary exertional level, approximately 6,700 in the national economy; addresser, DOT number 209.587-010, SVP of 2, sedentary exertional level, approximately 2,700 in the national economy; and document preparer, DOT number 249.587-018, SVP of 2, sedentary exertional level, approximately 19,000 in the national economy. Tr. 59.

The ALJ asked the VE's opinion regarding sit/stand tolerance for sedentary jobs. Tr. 59. The VE testified that he was referring to "someone who sits for 30 minutes and they'd have to stand up and stretch for two minutes before they return to their seat, they would be able to perform those occupations." *Id.* The VE testified that the use of a cane to ambulate to and from the workstation "would have no impact on these jobs." Tr. 60.

Plaintiff's counsel asked the VE the impact of an individual who would be absent two or more days a month due to a combination of impairments. Tr. 60. The VE testified "[t]hat individual would not be able to maintain employment." *Id.* The VE testified that employer tolerances for absenteeism are less than two days per month and employer tolerances for off-task behavior is less than 15 percent. Tr. 61.

When asked about conflicts with his testimony and the DOT the VE stated that his "testimony concerning push and pull, off task and absences was based upon [his] professional observation, training and experience." Tr. 61.

With no further testimony, the hearing closed. Tr. 63.

II.    Discussion

A.    The ALJ's Findings

In his July 9, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.
>
> 2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 18, 2016 through her date last insured of December 31, 2016 (20 CFR 404.1571 *et seq.*).
>
> 3.    Through the date last insured of December 31, 2016, the claimant had the following severe impairments: lumbar degenerative disk disease, right knee degenerative joint disease and status post right knee arthroplasty; hypertension; and obesity (20 CFR 404.1520(c)).
>
> 4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.　　After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: she was limited to no more than occasional climbing of ramps and stairs, and she could never climb ladders, ropes, or scaffolds. She was limited to only occasional stooping, kneeling, crouching, and crawling; and she was limited to only occasional pushing and pulling. Additionally, she had to avoid concentrated exposure to extreme vibration, unprotected heights and moving mechanical parts.

6.　　Through the date last insured of December 31, 2016, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.　　The claimant was born on [REDACTED] 1970 and was 46 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.　　The claimant has at least a high school education (20 CFR 404.1564).

9.　　Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.　　Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.　　The claimant was not under a disability, as defined in the Social Security Act, at any time from June 18, 2016, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g)).

Tr. 15, 20-21, 26-28.

B.　　Legal Framework

1.　　The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S.

389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff asserts the ALJ failed to explain his findings regarding Plaintiff's residual functional capacity ("RFC") as required by SSR 96-8p and erred in his evaluation of Plaintiff's subjective symptomology. Pl.'s Br. 13, 25, ECF No. 17.

A.    The ALJ's RFC Assessment

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4). Social Security Ruling 96–8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184 at *7. The ALJ must discuss the claimant's ability to "perform sustained work activities in an ordinary work setting" on a regular work schedule. *Id.* Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The ALJ determined Plaintiff had the RFC to perform sedentary work with some exceptions. Tr. 21. Plaintiff argues that the ALJ did not explain the lack of sitting restrictions in the RFC findings and did not properly consider her cane use. Pl.'s Br. 15-17.

### 1. ALJ's Alleged Failure to Include Sitting Restrictions

Plaintiff contends that despite her long history of treatment for low back pain and "repeated complaints of difficulty sitting for prolonged periods," the ALJ's RFC assessment does not include any provisions pertaining to her ability to sit. Pl.'s Br. 15. The Commissioner contends that the evidence, including Plaintiff's subjective reporting, does not support the inclusion of sitting

limitations and that "[n]o treating doctor opined that Plaintiff had sitting limitations." Def.'s Br.

11, ECF No. 21.

In his decision the ALJ cites to the testimony and medical evidence from the June 17, 2016

administrative decision of ALJ Susan Poulos (Tr. 104-13); medical treatment records, including

x-ray findings and bone scan results; and Plaintiff's testimony from the 2021 administrative

hearing. Tr. 15-26. Providing information regarding Plaintiff's impairments, the ALJ noted that

"medical records show that the claimant has a history of complaints of back and knee pain,

extending back several years prior to the June 17, 2016 [ALJ] decision. She reportedly sustained

an on-the-job injury in May 2010, while working in a Burger King restaurant." Tr. 15. The ALJ

further noted that "claimant's back pain has been managed conservatively since the alleged onset

date with medications and steroid injections." *Id.* As to Plaintiff's knee issues, the ALJ noted that

she had been diagnosed with degenerative joint disease in her right knee, undergone a "total right

knee arthroplasty in January 2015" and after surgery was reported to be doing well. *Id.* The ALJ

indicated that "[d]espite these good results, the claimant continued to report persistent knee pain

after August 2015; however, her treating professionals could find no clinical explanation for her

subjective complaints." *Id.* The ALJ cited to a January 2016 report of Plaintiff's surgeon, Dr.

Bradley Presnal, who indicated Plaintiff could return to work with sedentary duties and use of a

cane to help ambulate. Tr. 16. In another treatment record  cited by the ALJ, Plaintiff reported to

Dr. Presnal's physician assistant that her knee pain was improving and she did not report any back

pain. *Id.* When she returned to Dr. Presnal in October 2016, Plaintiff complained of "worsening

knee pain, as well as weakness, arthralgias, joint pain, back pain, and swelling in the extremities."

*Id.* The ALJ quoted Dr. Presnal's conclusion that Plaintiff had "'no obvious findings on her

examination of any mechanical stability or any anatomical problem.'" Tr. 17. Dr. Presnal indicated

he had nothing else to offer her and her "'impairment rating is unchanged and her work status is unchanged.'" *Id.* In his RFC discussion the ALJ noted Plaintiff's testimony that she had pain in her hip and back and she can sit for only five minutes. Tr. 22. The ALJ again cited the June 2016 decision of the previous ALJ who found Plaintiff retained the RFC to perform work at the light exertional level. *Id.* Here, ALJ Huggins determined that "rather than a wide range of 'light' work, with a 'sit/stand' option, [he] consider[ed] a more appropriate residual functional capacity would have been to limit the claimant to 'sedentary' work[.]" Tr. 23. The ALJ noted that "[r]egarding the claimant's allegations of disabling back and hip pain prior to her date last insured, a review of the treatment records from the period between June 2016 and December 2016, reveals almost no complaints of hip or back pain." *Id.* The ALJ further indicated:

> As noted previously, there is no imaging in the file of the claimant's back or hip from the period prior to her date last insured of December 2016. Additionally, since December 2016, no new x-rays of the claimant's back have been ordered by the claimant's treating professionals. All of this suggests to the undersigned that not only has the claimant made no serious allegations of back pain, but also that her treating professionals have not identified any significant findings to suggest that new x-rays of her cervical or lumbar spine were warranted.

*Id.* The ALJ further noted that it did not appear that Plaintiff "ever contacted vocational rehabilitation, or sought any other type of work, although it does appear that in January 2016, Dr. Presnal released her to return to work at the sedentary level, and in August 2016, her primary care providers at the Good Samaritan health Clinic suggested she would be a good candidate for VR services." Tr. 25. The ALJ considered the findings of the State agency medical consultants who opined that "claimant can sit for about six hours in a work day and can stand or walk for about two hours in a work day; can push and pull, lift and carry 20 pounds occasionally and 10 pounds frequently; and has some postural and environmental limitations." Tr. 26 (citing Ex. C1A at Tr. 76-77, and Ex. C4A at Tr. 93-94). While the ALJ agreed with the non-exertional functional

limitations of the State agency consultants, he found in making his "function-by-function assessment" that "rather than a limited range of 'light' work with a 'sit/stand option,' it is more appropriate (and more consistent with Dr. Presnal's conclusions) that during the period in question, from June 18, 2016, through her date last insured of December 31, 2016, the claimant was limited to a wide range of 'sedentary' work." Tr. 26. Accordingly, the ALJ fully explained his reasoning, finding that a sit/stand option was not necessary based on his restriction to sedentary work. That determination is supported by substantial evidence set out in the decision.

Plaintiff argues that the ALJ failed to analyze and reconcile her complaints of difficulty sitting with his RFC findings. Pl.'s Br. 15. However, it is clear from the decision that the ALJ evaluated the relevant evidence in the record that addressed Plaintiff's pain and issues with sitting, including the same medical records Plaintiff cites to support her argument that the ALJ should have reached a different conclusion. Despite the relevant period being June 18, 2016 through December 31, 2016, Plaintiff cites to only one record from the relevant period—the same October 2016 treating report of Dr. Presnal that the ALJ cited in his decision. Additionally, the ALJ expressly acknowledged Plaintiff's complaints of back pain made before and after the relevant period and her testimony regarding sitting restrictions. Nevertheless, upon review of the evidence the ALJ determined that rather than assessing Plaintiff with the ability to perform light work with a sit/stand option, the better functional assessment would be sedentary work—a determination consistent with Plaintiff's surgeon.

SSR 83-12 clarifies the use of the Medical-Vocational Rules as a framework for evaluating exertional limitations. SSR 83-13, 1983 WL 31253. Regarding the need to alternate sitting and standing, SSR 83-12 provides:

> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an

individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

1983 WL 31253 at *4. At the administrative hearing the VE identified three sedentary jobs that an individual with Plaintiff's limitations could perform. Tr. 59. The ALJ specifically asked the VE about sit/stand tolerance for sedentary jobs and the VE responded that someone who sits for 30 minutes and then stands to stretch for two minutes before returning to their seat could perform the occupations. *Id.* These are the same jobs identified by the ALJ at Step Five of sequential evaluation process.

The ALJ, not the court, is responsible for reviewing the evidence and making conclusions regarding the weight of the evidence. *Johnson v. Barnhart*, 434 F.3d at 653. Plaintiff has failed to show the ALJ erred in weighing of the evidence regarding an alleged need for additional sitting restrictions in making his RFC assessment.

### 2. ALJ's Consideration of Plaintiff's Use of a Cane

Plaintiff argues that the ALJ did not properly evaluate her use of a cane. Pl.'s Br. 21. Plaintiff contends that although the ALJ noted certain evidence in the medical record regarding her use or non-use of a cane, the ALJ did not reconcile his RFC findings with Plaintiff's testimony that she used a cane at all times or with treatment notes documenting antalgic gait and cane use. *Id.* at 22. Plaintiff also argues the ALJ failed to make the required evaluation under SSR 96-9p regarding the circumstances for which the assistive device is needed and consideration of the particular facts of the case. *Id.* The Commissioner argues that the "ALJ specifically considered Plaintiff's reporting that she used a cane, Dr. Presnal's rating that included using a cane, that

Plaintiff presented at appointments using a cane, and on many occasions following Dr. Presnal's rating, she presented at appointments not using a cane (Tr. 15-17, 22, 24-25, 27)." Def.'s Br. 13-14. The Commissioner noted that the ALJ's decision included the VE's testimony that the use of a cane to and from the workstation would have no impact on the identified sedentary jobs that Plaintiff could perform. *Id.* at 14. The Commissioner contends "Plaintiff failed to prove that she required the use of a cane in the RFC assessment." *Id.* at 15.

In his decision the ALJ first notes Plaintiff's occasional use of a cane following her 2015 knee surgery. Tr. 15. The ALJ cites to Dr. Presnal's January 2016 report that limited Plaintiff to sedentary work and the use of a cane to help ambulate with a limp. Tr. 16. For a record within the relevant time period, the ALJ cites to Dr. Presnal's October 2016 examination report where Plaintiff "was observed to have an antalgic gait, and for the first time in many months, she was observed to be ambulating with a cane." Tr. 16. Despite this notation, Dr. Presnal did not change Plaintiff's work status. Tr. 17. The ALJ noted that Plaintiff did not return to Dr. Presnal for follow-up until May 2017—after the relevant period. *Id.* The ALJ noted that at a later examination in September 2017 Plaintiff was observed to ambulate with a normal gait, and "she did not use a cane or any other type of assistive device for ambulation." *Id.* The ALJ cited to Plaintiff's hearing testimony where she stated that she uses a cane that was prescribed for her. Tr. 22. He also cited to an April 2018 consultative examination with Dr. Sushil Das who "specifically noted that the claimant walked without any difficulty and did not use or need a cane or any other type of assistive device for ambulation." Tr. 24. The ALJ determined that for the relevant period Plaintiff was capable of performing a wide range of work at the sedentary level. Tr. 25. He concluded:

> In reaching this decision, the undersigned considers the objective medical findings documented in the file from the period of the alleged onset date, through to and immediately after the claimant's date last insured to be the most persuasive evidence available on the question of the claimant's residual functional capacity

> prior to her date last insured of December 31, 2016. Those findings demonstrate that while the claimant exhibited some symptoms of decreased range of motion and subjective tenderness and pain, *she was also observed to ambulate effectively, without the use of an assistive device* and reported being able to perform her activities of daily living with minimal limitation.

*Id.* (emphasis added).

SSR 96–9p explains the policies regarding the capability of a claimant to do other work when the claimant has an RFC for less than the full range of sedentary work. Regarding exertional limitations, the Ruling provides:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7. The Ruling goes on to note that "an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee) . . . who is limited to sedentary work because of the impairment affecting the lower extremity," like Plaintiff, and "who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers." *Id.* The Ruling notes that in these situations it may be useful to consult a VE. *Id.*

Here, the only medical documentation in the relevant period regarding Plaintiff's use of a cane is Dr. Presnal's notation in October 2016 that Plaintiff used a cane to ambulate. However, despite this observation, he still found Plaintiff capable of working at the sedentary level. The ALJ cited to this evidence in his decision and considered it in making his RFC determination. Tr. 25

("Dr. Presnal also limited her to 'sedentary duty only' because of her need to use a cane and her limping gait (although as noted above, there were many other occasions after January 2016, including her April 2018 consultative evaluation, when the claimant did not use a cane, or walk with a limp)"). The ALJ also questioned the VE at the administrative hearing about the use of a cane for sedentary work. Tr. 60. At Step Five of the sequential evaluation the ALJ noted the following:

> When hypothetically asked by the [ALJ] about the effect of the claimant needing to use a cane for support on the jobs cited, the vocational expert confirmed that the claimant's use of a cane would not affect the availability or numbers of the jobs cited. Irrespective of the foregoing, however, any periods necessitating the use of a cane appear limited to periods of post-surgical recovery.

Tr. 27. The court finds ALJ properly considered Plaintiff's use of a cane in formulating his RFC assessment finding Plaintiff capable of performing sedentary work. Furthermore, as contemplated by SSR 96-9p, he consulted a VE to determine the effects of cane use on the occupational base.

      B.     ALJ's Evaluation of Plaintiff's Subjective Symptoms

Plaintiff argues the ALJ did not properly evaluate her subjective symptomology. Pl.'s Br. 25. Plaintiff contends "the ALJ's dismissal of [her] credibility is insufficiently explained." *Id.* at 27. Plaintiff repeats the arguments regarding her use of a cane and problems sitting, and further argues the ALJ failed to consider her subjective statements about pain.[5] *Id.* at 28-29. The Commissioner asserts the ALJ properly evaluated Plaintiff's subjective complaints. Def.'s Br. 16. The Commissioner argues that "the ALJ's decision shows he carefully considered all the evidence in the record and, where appropriate, made findings that favored Plaintiff." *Id.*

---

[5] Because the court has already addressed Plaintiff's allegations regarding use of cane and problems sitting in the discussion of the ALJ's RFC assessment and has determined the ALJ's findings to be supported by substantial evidence, that discussion will not be repeated here.

SSR 16-3p provides a two-step process for evaluating an individual's symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment "that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3. In the second step the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities . . . ." *Id.* at *4. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

The ALJ considered Plaintiff's subjective statements by using the two-step process outlined above. Tr. 21 (noting that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p.").The ALJ discussed Plaintiff's allegations as testified to at the administrative hearing, including that she "had undergone knee surgery in 2015, and was in pain. She said her pain now is the same as her pain was back in 2016." Tr. 22. The ALJ also noted Plaintiff's testimony that she has pain in her hip and constant pain in her back, that she was initially prescribed narcotics for her pain but those were stopped and she was prescribed Gabapentin, and that she has trouble sleeping and anxiety and mood problems because of pain. *Id.* The ALJ determined that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably have been expected to cause some of the alleged symptoms prior to her date last insured of December 31, 2016. However, the claimant's statements concerning the intensity,

persistence and limiting effects of these symptoms *at that time* are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

*Id.* (emphasis added).

The ALJ then outlined the objective medical evidence including diagnostic testing and treatment records and the assessments of various physicians. The ALJ noted that "[r]egarding the claimant's allegations of disabling back and hip pain prior to her date last insured, a review of the treatment records from the period between June 2016 and December 2016, reveals almost no complaints of hip or back pain." Tr. 23. The ALJ cited to a lumbar x-ray made in 2013 and the lack of x-rays of Plaintiff's back or hip from the period prior to Plaintiff's date last insured. The ALJ noted that no x-rays were ordered by her treating providers after December 2016. *Id.* The ALJ stated that this suggested to him "that not only has the claimant made no serious allegations of back pain, but also that her treating professionals have not identified any significant findings to suggest that new x-rays of her cervical or lumbar spine were warranted." *Id.*

The ALJ noted that beginning in July 2017 (after the relevant period), Plaintiff "began to make regular complaints of back pain to primary care providers" but that throughout the same period of time she "continued to deny experiencing any back pain to her orthopedic specialist, Dr. Presnal." Tr. 23. The ALJ further noted that "even after the claimant's date last insured of December 2016, treatment records reflect almost no complaints of hip pain, and no significant findings for more than two years." *Id.* The ALJ discussed Plaintiff's April 2018 consultative physical evaluation with Dr. Das who reported that she was uncooperative throughout the examination. *Id.* The ALJ indicated that at the evaluation Plaintiff "reported being unable to work because of knee pain, her right knee arthroplasty, back pain, migraine headaches, hypertension,

and acid reflux." *Id.* The ALJ noted that despite telling Dr. Das she had several postural limitations, she stated she was able to carry out her activities of daily living without assistance. Tr. 24.

The ALJ concluded by finding Plaintiff's "testimony to be supported by the evidence, to the extent that she can no longer perform her previous work at the 'medium' exertional level required." *Id.* However, after "careful consideration of the evidence as a whole," the ALJ was "convinced that there was not a period of 12 continuous months after the amended alleged onset date of June 18, 2016, through and after the claimant's date last insured of December 31, 2016, in which the claimant did not have the residual functional capacity for a wide range of work at the 'sedentary' exertional level." Tr. 25.

Here, the ALJ considered all of Plaintiff's symptoms, including pain, and he assessed Plaintiff's statements about her symptoms and her functionality. While the ALJ discussed the objective evidence or, at times, the lack of objective evidence, the ALJ did not disregard any of Plaintiff's subjective statements regarding pain—even those complaints that were made outside of the relevant period. Plaintiff points to no statements she made or symptoms she had during the relevant period that the ALJ overlooked. Based on the undersigned's review of the record and applicable law, the court finds that the ALJ's decision reflects that he followed the two-step process in evaluating Plaintiff's symptoms. The ALJ also cited to evidence in the record to support his conclusion. Accordingly, the ALJ properly applied SSR 16-3p and his determination regarding Plaintiff's subjective statements is supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court affirms the Commissioner's decision.

IT IS SO ORDERED.


August 18, 2023                                    Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge